UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HAYAT SINDI, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-10798-IT |
| | * | |
| SAMIA EL-MOSLIMANY and ANN EL-MOSLIMANY, | * | |
| | * | |
| | * | |
| Defendants. | * | |

ORDER ON RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL

October 6, 2016

TALWANI, D.J.

This case involved allegations that Defendants Samia El-Moslimany and Ann El-Moslimany engaged in a campaign to discredit Plaintiff Hayat Sindi professionally and personally. The campaign included blogs focusing on Plaintiff, emails and other online communications about Plaintiff sent to various audiences, and Defendants' appearance at conferences and public events to distribute leaflets about Plaintiff.

After deliberation, the jury found that both Defendants were liable to Plaintiff for defamation, intentional infliction of emotional distress, intentional interference with contractual relationships, and intentional interference with prospective business relationships.

The jury awarded Plaintiff a total of $3,500,000 in damages. Under the jury's award, Samia El-Moslimany is liable for: $400,000 for defamation, $2,000,000 for intentional interference with contractual relationships, $400,000 for intentional interference with prospective business relationships, and $100,000 for intentional infliction of emotional distress, and Ann El-Moslimany is liable for: $100,000 for defamation, $400,000 for intentional interference with

contractual relationships, and $100,000 for intentional interference with prospective business relationships. Jury Verdict [#198].

Before the court are Defendants' post-trial motions. For the following reasons, Defendants' motions for judgment as a matter of law and for a new trial [#212, #214] are DENIED. Defendants' motion to alter or amend the judgment is ALLOWED IN PART.

A. Motions for Judgment as a Matter of Law and Motion for New Trial

    a. Standards of Review

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 "only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." Crowe v. Bolduc, 334 F.3d 124, 134 (1st Cir. 2003) (internal quotation marks and citations omitted). This court "is not free to make credibility determinations or to weigh the evidence." Jordan-Milton Mach., Inc. v. F/V Teresa Marie, II, 978 F.2d 32, 34 (1st Cir. 1992).

A motion for new trial under Federal Rule of Civil Procedure 59 may be granted when "the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice." Payton v. Abbott Labs, 780 F.2d 147, 152 (1st Cir. 1985). Absent an error of law, a court should set aside the jury's verdict only if "it is quite clear that the jury has reached a seriously erroneous result." Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988) (quoting Borras v. Sea-Land Serv., Inc., 586 F.2d 881, 887 (1st Cir. 1978)). The court "cannot displace a jury's verdict merely because" the court "disagrees with it or because a contrary verdict may have been equally . . . supportable." Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009) (internal quotation marks and citation omitted).

*b. Intentional Infliction of Emotional Distress*

Defendants argue that they are entitled to judgment as a matter of law or new trial on the intentional infliction of emotional distress claim on the grounds that their behavior was not extreme and outrageous and that Plaintiff did not suffer damages.

To succeed on a claim of intentional infliction of emotional distress, Plaintiff had to show that (1) Defendants intended, knew, or should have known that their conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe. See Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014).

Conduct is extreme and outrageous "only if it go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012) (alterations in the original)). Conduct is not extreme and outrageous if it consists only of "mere insults, indignities, threats, annoyances, petty oppressions, and other trivialities." Id. (quoting Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997)). But, extreme and outrageous conduct may be found in the "totality of circumstances," as "[r]epeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." Boyle v. Wenk, 392 N.E.2d 1053, 1055-56 (Mass. 1979).

The jury's finding that Defendants' conduct was extreme and outrageous was neither lacking of evidentiary basis nor against the weight of the evidence. The jury could have found from the evidence presented at trial that Defendants engaged in more than "mere insults, indignities" or "threats." Polay, 10 N.E.3d at 1128 (quoting Tetrault, 681 N.E.2d at 1197).

Instead, the jury could have viewed the evidence as demonstrating that Defendants engaged in a long and continuous campaign of harassment against Plaintiff that stretched over several years. First, as both Plaintiff and Samia El-Moslimany testified, Samia El-Moslimany sent emails and text messages to Plaintiff wishing that she would be ruined professionally and personally, and expressing hope that Plaintiff would get cancer. Then, as Plaintiff, Defendants, and witnesses (Myer Berlow, Joi Ito) testified, Defendants sent correspondence to many of Plaintiff's business contacts over a period of years, parroting false allegations about her professional and academic accomplishments. Both Plaintiff and Defendants further testified that Defendants posted comments stating the same false allegations about Plaintiff on many articles and other media about Plaintiff. Additionally, as Plaintiff and Defendants testified, Samia El-Moslimany handed out flyers and pamphlets at several conferences at which Plaintiff was speaking. Finally, as Plaintiff and Samia El-Moslimany testified, Samia El-Moslimany traveled to Plaintiff's mother's residence. In looking at Defendants' actions over a period of years, the jury had more than sufficient evidence to find that these actions were extreme and outrageous, and the jury's finding was not against the weight of the evidence.

As to emotional distress, Defendants argue that medical records that they introduced at trial show that Plaintiff had ongoing medical issues *before* her interactions with Defendants and that Plaintiff thus fails to show she suffered Damages that Defendants caused. "Plaintiffs are not required to present medical evidence for a jury to find that their alleged distress was caused by the Defendants' conduct." Ciolino v. Eastman, 128 F. Supp. 3d 366, 379 (D. Mass. 2015) (citing Cady v. Marcella, 729 N.E.2d 1125, 1132 (Mass. App. Ct. 2000) (noting that expert medical testimony is not required for jury to determine intentional infliction of emotional distress claim)). Plaintiff testified that she suffered headaches, lack of sleep, anxiety, stomach aches, and heart

palpitations. She further testified that she saw various medical professionals as a result of these physical symptoms, including a cardiac surgeon, and that she suffered strained personal relationships.

To be sure, medical records and a showing that Plaintiff had not suffered any health problems before her interactions with Defendants would have strengthened Plaintiff's case on damages. Nonetheless, based on Plaintiff's testimony as to her emotional distress and as to the severity and longevity of Defendants' actions, the jury had sufficient evidence to find that Plaintiff suffered damages, and the jury's finding was not against the weight of the evidence. See Stonehill Coll. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 205, 225 (Mass. 2004) (noting that the jury can consider nature and character, severity, and length of time of alleged harm).

Accordingly, Defendants are entitled to neither judgment as a matter of law nor a new trial on the intentional infliction of emotional distress claim.

    c. *Intentional Interference with Contractual and Prospective Business Relationships*

To prove tortious interference with contractual relationships, Plaintiff had to prove that (1) she had a contract or prospective business relationship with a third party, (2) that Defendants knew about that contract or relationship, (3) that Defendants intentionally and through improper means or motive interfered with that contract or relationship, and (4) Plaintiff suffered harm as a result of that interference. See Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992); Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982).

Defendants argue that Plaintiff did not prove that she had a contract or business relationship with a third party and that Defendants knew about that contract or business relationship.

Defendants are correct that Plaintiff failed to prove the existence of a contract with Kube Publishing Ltd. to publish Plaintiff's planned biography or that Defendants knew about that purported contract. However, there was sufficient evidence, and it was not against the weight of the evidence, for the jury to find that Plaintiff had a contract and prospective business relationship with the Institute for Imagination and Ingenuity (the "i2 Institute"). Plaintiff testified that, in exchange for her work for i2—fundraising for i2 and putting together programs and conferences for young students—she would be paid a salary of about $10,000 per month and receive other benefits.

Further, there was evidence at trial that Samia El-Moslimany sent an email containing false allegations against Plaintiff—ones which both Defendants had previously used—to the US Consul General in Jeddah, Saudia Arabia. The same day, a nearly identical email was sent to board members of the i2 Institute from a sender with an alias "Abdullah Alhaq." In addition, Ann El-Moslimany sent an email with similar allegations to Joi Ito (who testified to receiving this email), who had been publicized as a speaker for the i2 Institute. The jury could infer from the evidence that Defendants knew about Plaintiff's involvement with i2 (based on Ann El-Moslimany's sending an email to Joi Ito) and that Defendants interfered with Plaintiff's contract with i2 (based on the email sent via an alias to the i2 board members that was almost identical to one that Samia El-Moslimany sent to the US Consul General in Jeddah).

There was also sufficient evidence, and it was not against the weight of the evidence, for the jury to find, based on Plaintiff's testimony, that but for Defendants' interference, Plaintiff would have continued to receive a salary from the i2 Institute.[1]

---

[1] Plaintiff also testified as to various specific individuals and companies (Fadi Ghandor, Al Faisal University, Siemens Corporation, and others) who had promised investment in Plaintiff's business endeavors, Synoptix and the i2 Institute. The court does not have to delve into whether

Accordingly, Defendants are not entitled to judgment as a matter of law or a new trial as to their intentional interference claims.

    *d. Defamation*

To prove defamation, Plaintiff had to show that Defendants "published a false statement regarding [Plaintiff]—that is, [Defendants] communicated the statement concerning [Plaintiff] to a third party," the statement was defamatory, such that it "could damage [Plaintiff's] reputation in the community," and "the statement caused economic loss or is otherwise actionable without proof of economic loss." Flagg v. AliMed, Inc., 992 N.E.2d 354, 365 (Mass. 2013). In addition, because Plaintiff conceded at trial that she was a limited public figure, Plaintiff also had to prove that Defendants made the statement "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Herbert v. Lando, 441 U.S. 153, 156 (1979) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)).

Defendants argue that Plaintiff failed to show that Defendants' statements about her were false or that Defendants made the statements with knowledge or reckless disregard of their falsity. Defendants point to various statements that could potentially be considered opinion (for example, Plaintiff's ability as a scientist) or that, given the evidence Defendants presented, were maybe only made negligently (for example, whether Plaintiff has ever misrepresented her age).

But, Defendants leave out of their argument statements that they made which were statements of fact made with no evidence as to their truth: that Plaintiff is an academic and scientific fraud; that Plaintiff received awards meant for young scholars or other youth by lying

---

Plaintiff proved that she—rather than the companies that she had set up—had prospective business relations with these potential investors, or whether Defendants knew about these investors, because Plaintiff has shown a prospective business relation in her future employment at the i2 Institute.

about her age; that Plaintiff was fraudulently awarded her PhD; that Plaintiff did not conduct the research and writing of her dissertation; that Plaintiff had a non-existent role in the founding of Diagnostics For All; and that Plaintiff did not lead a team of six people that won the MIT Entrepreneurship Competition.

      Defendants argue that, to the extent these statements were false, Defendants' fault was a mere failure to investigate, lack of journalistic standards, or exaggerations. But there was sufficient evidence (and it was not against the weight of the evidence) for the jury to find that Defendants did not merely fail to live up to journalistic standards or engage in hyperbole, but instead had a reckless disregard for the truth or falsity of their statements. Ann El-Moslimany testified that she published statements about Plaintiff without doing any independent research about them, instead relying solely on her daughter, Samia El-Moslimany, as to whether those statements were true. Samia El-Moslimany testified that she relied completely on sources, such as ex-relationship partners, that appear to be biased against Plaintiff. For some statements, she relied on minor discrepancies in material that she read and made wild inferential leaps based on that material without doing any further research. For example, she found a discrepancy in a newspaper article about Plaintiff's age and consequently published the statement that Plaintiff lied about her age to organizations to obtain awards meant for younger people, but she admitted at trial that she had no evidence of Plaintiff actually lying to these organizations. She even manipulated sources on which she relied so that they would make statements that fit her narrative. For example, Samia El-Moslimany spoke to Myer Berlow twice. During the first conversation, Berlow made no disparaging statements about Plaintiff. In the second conversation, he did, but only after Samia El-Moslimany first attempted to convince Berlow of Plaintiff's alleged fraud. Defendant testified that she decided to ignore the first conversation and

adopt the second in attributing some of the defamatory statements about Plaintiff to Berlow.

Defendants then argue that Plaintiff failed to show that she suffered damages. Plaintiff and other witnesses (Myer Berlow, Joi Ito) testified that she had lost business opportunities and suffered reputational damage. In addition, Plaintiff testified that she suffered emotional distress. This evidence is sufficient to sustain the jury's verdict and to render the verdict not against the weight of the evidence. That Plaintiff had other successes—for example, being appointed to the Saudi Arabia Shura Council in 2013, being featured in magazines such as Newsweek and National Geographic, and receiving the 2014 Clinton Global Citizen Award—does not necessarily show a lack of reputational damage. The jury could properly consider that recognition and still find that Plaintiff's testimony and other evidence presented at trial showed that her reputation was harmed.[2]

Accordingly, Defendants are not entitled to judgment as a matter of law or a new trial on defamation.

B. Damages

Defendants move the court in the alternative to reduce damages. They first argue that the award of damages must have been based on passion or prejudice and, in particular, awarding punitive damages to Plaintiff where none were authorized. But nothing indicates that the jury so fashioned its award. The court instructed the jury that it could not award punitive damages, and the court is "entitled to assume that the jurors would follow [her] instructions." Commonwealth v. McCowen, 939 N.E.2d 735, 752 (Mass. 2010). Further, the damages were not so "great . . . that it may be reasonably presumed that the jury, in assessing them . . . were influenced by

---

[2] In any event, Plaintiff received much of this recognition before much of Defendants' defamatory campaign.

passion, partiality, prejudice or corruption." Reckis v. Johnson & Johnson, 28 N.E.3d 445, 466-67 (Mass. 2015) (internal quotation marks and citations omitted). Given the evidence presented at trial and the jury's questions during deliberations relating to economic damages, the court is satisfied that the jury fashioned its award rationally based on the evidence and not based on prejudice and sympathy.

Defendants further ask the court for remittitur of damages. "In reviewing an award of damages, the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur . . . only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003) (quoting E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 502 (1st Cir. 1994)).

The damages award of $100,000 against Samia El-Moslimany for intentional infliction of emotional distress is sustained. As stated above, although Plaintiff did not introduce substantial medical record evidence to show her damages, her testimony about her emotional distress coupled with evidence of the extended and severe nature of Defendants' actions is more than sufficient to merit an award of $100,000.

The damages award for defamation—$400,000 against Samia El-Moslimany and $100,000 against Ann El-Moslimany—is also reasonable and will remain. Plaintiff and other witnesses, such as Joi Ito and Myer Berlow, testified as to the harm in her reputation, lost salary, and specific lost business opportunities. Further, it was reasonable for the jury to infer that Defendants continuing their conduct over many years and in many forms (handing out flyers with false statements at Plaintiff's conferences, making comments on various forms of media, sending out false statements about Plaintiff to Plaintiff's business contacts) significantly harmed

her reputation. Additionally, Plaintiff described in detail the emotional distress that she suffered. Taken together, the jury's damage award was not unreasonable.[3]

However, as to intentional interference with contractual relations, the full damages award cannot be sustained based on the evidence presented. Plaintiff puts forward her contract with i2 as the contract with which Defendants interfered. But the evidence presented does not rationally support the jury award of a total of $2,400,000. Plaintiff testified that, from 2013 to 2015, she was entitled to a salary of $10,000 a month—$120,000 per year, and totalling $360,000 for that time period—which she did not receive. Along with her testimony that she had personally paid for some of i2's expenses and had lost out on benefits, and the reasonable inference that the contract with i2 would have continued for a number of years if not for Defendants' interference, Plaintiff's damages from that interference could have been double that amount, but not seven times that amount. Accordingly, the total damages for intentional interference with contractual relations will be reduced to $576,000 from Samia El-Moslimany and $144,000 from Ann El-Moslimany.

But, the damages award for intentional interference with prospective business relationships is a rational award. The jury could infer that the i2 Institute could have stayed active and continued for at least another four, if not more years. Accordingly, a total damages award of $500,000 ($400,000 against Samia El-Moslimany and $100,000 against Ann El-Moslimany) is reasonable based on the evidence.[4]

---

[3] Defendants bring to the court's attention various defamation verdicts that were lower than the award here. See Mem. Law Supp. Defs.' Mot. New Trial, Ex. 1 [#215-1]. None of those cases, however, included as long and severe of a campaign of defamation as this one, so it is unsurprising that the damages award here is higher.

[4] Any damages based on Plaintiff's other business relationships would be unduly speculative. Although she identified potential investors in her businesses and, for some, the amount of the

C. Conclusion

For the reasons stated above, Defendants' Renewed Motion for Judgment as a Matter of Law [#212] is DENIED, but Defendants' Motion for a New Trial or in the Alternative to Alter or Amend Judgment [#214] is ALLOWED IN PART and DENIED IN PART. Damages for intentional interference with contractual relations are decreased from $2,000,000 to $576,000 against Samia El-Moslimany and from $500,000 to $144,000 against Ann El-Moslimany. Otherwise, the verdict and damages award is undisturbed.

IT IS SO ORDERED.

October 6, 2016                                        /s/ Indira Talwani
                                                       United States District Judge

---

promised funding, she brought forth no evidence as to how much money she would personally have made from the investments into her business ventures.